FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

00 JUN -5 PM 4: 14

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **EDWARD O'BRIEN WILLIAMS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Civil Action No. CV-99-S-184-NW** |
| | ) |
| **HELIG MYERS DISTRIBUTION** | ) |
| **CENTER,** | ) **ENTERED** |
| | ) |
| **Defendant.** | ) **JUN 5 2000** |

**MEMORANDUM OPINION**

Plaintiff is a former order picker operator at defendant's distribution center located in Russellville, Alabama.  He claims that defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the common law of Alabama.  Specifically, plaintiff complains that defendant failed to promote him, failed to compensate him for leave, negligently supervised its employees, retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission, and constructively discharged him.

This action is before the court on defendant's motion for summary judgment (doc. no. 26).  For the reasons stated below, the court finds that the motion is due to be granted with respect to plaintiff's allegations of discrimination, but denied as to

plaintiff's state law claim, over which this court declines to exercise supplemental jurisdiction.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.)  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  When the moving party has discharged its burden, the non-

2

movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A

"genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in the light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff, who is of African-American heritage, was hired by Edward Kaplan, the plant manager of defendant's Russellville, Alabama distribution center, on August 23, 1993.[1] Plaintiff previously had worked for defendant for approximately one year, but had voluntarily resigned that first period of employment in order to accept a higher-paying position with a different company.[2] On both occasions, plaintiff operated an "order picker": that is, a piece of equipment similar to a forklift that is used to assist

---

[1] Plaintiff's deposition at 31; Kaplan's affidavit ¶ 3.

[2] Plaintiff's deposition at 21-22.

employees in moving furniture around defendant's warehouses.[3]

As an order picker operator, plaintiff reported directly to a "lead man"; lead men in turn report to supervisors.[4] Lead men work closely with supervisors, and are responsible for conveying supervisory instructions to order picker operators.[5] All supervisors report to Ricky Wagnon, the assistant plant manager, and Wagnon reports to the plant manager, Kaplan.[6]

Whenever a lead man is absent from work, his supervisor selects an order picker operator to serve as a "back-up lead man."[7] These appointments are temporary, and are not accompanied by any increase in pay or benefits.[8]

> There are some that are chosen for that particular day, [and] the next day go back to their regular responsibilities. ... The more a person proved themselves during this backup role position, the more inclination we would have to use them the next time we needed a backup position and a person in a backup role or to fill in for a crew leader. There is no set position. There is no set date of a position starting in this backup role. It is just an as-needed program. [9]

Should a lead man position become available, however, prior service

---

[3] *Id.* at 36-37; Kaplan's deposition at 64.

[4] Plaintiff's deposition at 40.

[5] *Id.* at 44.

[6] *Id.* at 40-41.

[7] Kaplan's deposition at 54-55.

[8] Plaintiff's deposition at 92-93.

[9] Kaplan's deposition at 54-55.

as a back-up lead man was favorably considered.[10]

> Q.    ... When you are looking to fill the [lead man]
> position,[11] are you only looking at those persons
> who have filled in as a backup before, or do you look
> at all the persons who are in the order picker
> position...?

> A.    Nobody would be exempt from our consideration, but we
> are looking for the most qualified person.  The ones
> that have filled in ... certainly have more
> qualifications than somebody that has never done it
> before.[12]

Final promotion decisions are made by Kaplan after consultation

with all of the employee's supervisors.[13]  No formal application

process has been implemented for most of defendant's supervisory

positions, however, including lead man.[14]

> Q.    ... If an employee wants to be promoted to another
> position, how do they make that known to the company?

> A.    By their actions and their performance.

> Q.    What do you mean "by their actions"?

> A.    How they handle themselves at work, how they perform,
> their attitude, their attendance, their desire.  All
> those things become obvious to myself and the rest of
> the management staff as to somebody that is
> interested in moving along and interested in learning
> more.  That[,] in addition to somebody talking to me

---

[10] *Id.* at 56; plaintiff's deposition at 93..

[11] The terms "crew leader" and "lead man" are synonymous.  For consistency
and clarification in this opinion, the court will refer to them solely as "lead
man" positions.

[12] Kaplan's deposition at 56.

[13] *Id.* at 45.

[14] *Id.* at 44-47.

and coming to me and telling me that they are
interested or on the review form mentioning it
there.[15]

## A. The Back-up Lead Man and Lead Man Positions

Sometime before January 1, 1997, Mark Moore, a white male, was

appointed to temporarily fill the position of back-up lead man.[16]

After hearing about the appointment, plaintiff complained to

Kaplan.[17]  Plaintiff argued that Moore was appointed only because

of a deal that he made with Phil Cantron, plaintiff's supervisor.

Q.    After Mark Moore was placed in the Back-up Leadman
      position, you complained to Ed, correct?

A.    Yes.

Q.    And you complained to Ed because Mark Moore had much
      less seniority than you did?

A.    No.

Q.    Okay. ... Why did you complain to Ed?

A.    Because I was present when Mark Moore made a deal
      with Phil.  Byron Harrison was getting ready to go to
      the receiving dock in a Back-Up Leadman position,
      whatever would have been coming available.

      Mark Moore made Phil a deal.  The deal was that if he
      let him be a Back-Up Leadman, he would check errors
      in the new building.  Phil said start today.  When
      workers is able to bribe supervisors into a position,
      it don't matter how hard you work, if someone bribes
      a Supervisor and the Supervisor takes the bribe,

---

[15] *Id.* at 44.

[16] Plaintiff's deposition at 173-74.

[17] *Id.* at 174-175.

you're not going to get what you deserve.

...

Q.   So, you go to Ed and you tell Ed you don't think it's
     fair that Mark Moore got the position of back-up lead
     person, right?

A.   Right.

Q.   And the reason you thought it wasn't fair that Mark
     Moore got the back-up lead person position was that
     he had made a promise to Phil Cantron, correct?

A.   Yes.

Q.   And the promise he made to Phil Cantron was that if
     he made Mark Moore the back-up lead person, he would
     also do this other job in the new building?

A.   And also I wasn't on — they was like buddy — there
     was a buddy-buddy system going on, and I believe in
     doing my own job.  I didn't suck up to no Supervisor,
     I done my own job.  The white workers done the buddy-
     buddy system, I didn't.

Q.   So Mark Moore, he kissed some behind, in other words?

A.   A lot.[18]

Another white male, Jason Borden, also became a back-up lead man,

but plaintiff does not remember if Borden was appointed before or

after Moore.[19]

     As a result of plaintiff's complaint, Kaplan appointed him to

act as a back-up lead man.[20]  While serving in this capacity, Phil

---

[18] *Id.* at 174-177.

[19] *Id.* at 206, 126.

[20] *Id.* at 178-180.

Catron, a Caucasian male, was plaintiff's supervisor, and Tommie Clay, an African-American male, was plaintiff's trainer.[21]

Catron cited plaintiff for insubordination and failure to follow instructions on January 14, 1997.[22]  His formal disciplinary report included the following statements:

> Mr. Williams has been given an opportunity to stand in as a crew leader or lead man and has struggled with this responsibility.  He has repeatedly had problems dealing with the employees in his area, and it not aware enough to know when his section is in trouble and needs help.
> . . .
> My recommendation is that Mr. Williams not be given this extra responsibility any more and that he be moved back to the old building to locate so that he can have better supervision and training. [23]

Additionally, Clay wrote a letter to Catron, complaining about plaintiff's performance in the back-up lead man role.  He stated, in pertinent part:

> I am of the opinion that Brian at this point is absent of some basic leadership skills....   His methods with the people he works with and also with operations are self serving....
> . . .
> I do not recommend him for leadership. [24]

Catron gave copies of both documents to Kaplan, and Kaplan arranged a meeting with plaintiff, Clay, Thomas Dugan, and Darryl

---

[21] *Id.* at 85.

[22] *Id.* at exhibit 35.

[23] *Id.*

[24] Clay's affidavit, exhibit 1.

Milton.[25]  Kaplan showed plaintiff a copy of Catron's disciplinary letter and asked him to sign it, but plaintiff refused, denying the allegations that he "struggled" with the responsibility of back-up lead man, and that he lacked "basic leadership skills."[26]

Plaintiff received another formal disciplinary reprimand on March 30, 1998, because the "shock switch" on his order picker was activated.[27]  The shock switch usually is activated when an order picker collides with an object at a high rate of speed.[28]  Plaintiff denies that he was driving fast, and also argues that white operators have activated their shock switches but have not been written up.[29]  He admits, however, that his pay was not reduced as a result of this incident, nor were his job responsibilities altered in any way.[30]

Sometime after May 11, 1998, a leadman position became available.[31]  Plaintiff did not formally apply for the position because, as previously observed,[32] defendant did not have a formal

---

[25] *Id.* at 188.

[26] Plaintiff's deposition at 187-189.

[27] *Id.* at 127.

[28] *Id.* at 129.

[29] *Id.* at 131.

[30] *Id.* at 130-131.

[31] *Id.* at 243-46; *see also* plaintiff's brief at 10.

[32] *See* text accompanying notes 14 and 15 *supra*.

application procedure.[33]  Plaintiff did indicate, however, on August 28, 1996, the date he signed his 1996 employment evaluation, that he was interested in obtaining a leadman position.[34]

Plaintiff did not receive the promotion to lead man.  Kaplan promoted Charles Phillips.  Plaintiff contends that he was more qualified than Phillips.[35]  Plaintiff believes that Phillips was promoted, because "he constantly lied on me and kept me in trouble," and he "kiss[ed] up" to Kaplan.[36]  Phillips' race is African-American.[37]

## B. Plaintiff's Allegations of Unpaid Leave

After plaintiff had been employed with defendant for a certain period of time, he was eligible to receive paid holidays, such as Thanksgiving and Christmas Day, as well as paid vacation days that the company policy referred to as "days of choice."[38]  In order to receive holiday pay, defendant's policy required "permanent employees [to] work their regularly scheduled day *before* and day *after* the holiday unless employee is out with an excused absence."[39]

---

[33] Plaintiff's deposition at 243.

[34] Plaintiff's exhibit L; plaintiff's deposition at 70.

[35] Plaintiff's deposition at 244.

[36] *Id.* at 244-245.

[37] *Id.* at 245.

[38] *Id.*, exhibit 21.

[39] Although this was not defendant's original policy, plaintiff admits that he was informed of the policy once a change was initiated.  Plaintiff's deposition at 100-101 (emphasis in original).

The policy also limited the usage of days of choice, stating that "[n]o more than two [d]ays ... should be taken at one time."[40]

At some point in 1998, plaintiff requested a day of choice.[41] Plaintiff was not paid for that day, and admitted that he did not work the day before his day of choice.[42]  Plaintiff contends that the reason he did not work the day prior to his day of choice because he was sick.[43]   Although plaintiff admits that he technically should not receive pay for his day of choice under the terms of the policy, he argues that defendant's leave policy is discriminatorily applied in favor of white employees.[44] He contends that discriminatory animus is evident in the fact that Terry Demastus, a white employee, was not fired for violating defendant's call-in procedure.[45]

> Q.   Now, you say down here that another worker named Terry didn't call in, and I'm not exactly sure what you're trying to say.

> A.   What that is, Terry Demastus didn't call in sick one day.  Ed went to Steve, told Steve if you get in touch with him, have him call in ... I won't fire him. ...

> Somehow somebody got in touch with his wife, his wife

---

[40] *Id.*, exhibit 21 at 2.
[41] *Id.* at 227-228.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 249.
[45] *Id.* at 227-231, 249-250.

called in,  which is a clear violation of company
policy, Ed accepted it, didn't fire him and paid him
sick pay.

. . .

Q.     Do you know whether or not that was his day of
choice?

A.     Sick day.

Q.     It was a sick day?

A.     Yes.  That's what Ed paid him for....

. . .

Q.     So, you're comparing what happened with you [to] what
happened to Terry and you feel its unfair?

A.     I know its unfair.[46]

In an unrelated incident, plaintiff's father-in-law died, which
resulted in him being absent from work, and plaintiff complains
that defendant only paid him for two days of "funeral leave," but
paid Andy Bailey, another employee,[47] for three days.[48]

## C. Plaintiff's EEOC Charge and Subsequent Events

Plaintiff filed a charge of discrimination with the EEOC on May
11, 1998, complaining that "[o]n or about December 1, 1997, the
above named employe[r] failed to promote me to the position of lead

---

[46] *Id.* at 228-231.

[47] The court notes that plaintiff has not disclosed Andy Bailey's race.
*See* plaintiff's brief at 7.

[48] *Id.* at 252.

13

man."[49]   Subsequent to the filing of his EEOC charge, plaintiff contends that certain privileges were taken away from him in retaliation for complaining of racial discrimination.  Plaintiff complains of four retaliatory events: 1) defendant's agents ceased to inform him of quality control meetings and excluded him from attending them;[50] 2) he  was forced to work in the old building instead of the new building;[51]  3) he was not allowed to have a battery changer license;[52] and 4) he was not allowed to drive a forklift.[53]

Plaintiff objects to being excluded from quality control meetings, because those meetings provided him with an opportunity to voice his complaints against the company.[54] He admits, however, that even before he filed his EEOC charge he did not regularly attend the meetings.

Q.   Now, were all the employees supposed to go to the quality control meetings?

A.   They'd pick about one out of every [department] —— one off receiving, one from the rack, one off night shift rack, one off of night shift shipping.

Q.   So, the quality control meetings were meetings that

---

[49] Plaintiff's exhibit D.

[50] Plaintiff's deposition at 262.

[51] *Id.* at 266.

[52] *Id.* at 272-74.

[53] *Id.* at 267.

[54] *Id.* at 268.

> some employees got to go to and others did not?

A.   Yes.

Q.   Before you filed your EEOC charge, do you agree with me that you didn't go to all the quality control meetings, did you?

A.   But I had an opportunity to voice my opinion.  They used to let me know so if I had a complaint or a suggestion, I could relay it through whoever in the rack was going.[55]

Plaintiff also complains of being forced to work in the old building, and contends that this placement decreased his ability to earn monetary bonuses.[56]  Specifically, plaintiff testified that his bonuses were based on the total weight of the items he moved during the day.[57]  The items in the new building included couches and chairs, and were heavier than those in the old building.[58]

Third, plaintiff objects to defendant's refusal to allow him to obtain his battery changer license.[59]  Plaintiff wanted this license because it would allow him to take "a break" from his regular responsibilities as an order picker operator.

Q.   ... [W]hat did a battery changer license entitle you to do?

A.   Change batteries.

---

[55] *Id.* at 268-269.

[56] *Id.* at 148.

[57] *Id.* at 148-149.

[58] *Id.* at 145.

[59] *Id.* at 272.

Q.    In what?

A.    Order Picker.

Q.    How often would you have to change the battery in the
      Order Picker?

A.    Whenever someone needed it.

Q.    Now, if you were doing your Order Picker duty and
      someone else in the facility needed to have their
      battery changed, would that mean you would have to
      stop what you're doing and go change their battery?

A.    Yes.

Q.    So, it was extra work?

A.    No.

Q.    It was not extra work?

A.    No.

Q.    Why do you say that?

A.    Because you get to sign off and you get a break from
      locating [furniture] and change someone's battery
      just like a breather.

Q.    So, having a battery changer license was nice because
      it would give you a breather or change of pace from
      what you were doing?

A.    Yes.

Q.    But it didn't amount in any more pay?

A.    No.

Q.    Or anymore [sic] responsibilities?

A.     No.[60]

Finally, plaintiff complains that one of his supervisors, Tim
Wells, forbade him to drive a forklift.[61] Company policy required
forklift drivers to have a license before they were given
permission to drive.[62] Plaintiff admits that he did not have a
license, but claims that Wells "let a white worker with less time
than me ride the forklift without a license."[63] Plaintiff does not,
however, identify the white employee by name.

Plaintiff resigned from his employment with defendant on May 1,
1999.[64] He contends that he resigned because:

> I was tired of being harassed, discriminated against and
> home office wouldn't come and investigate it, and I was
> under a lot of stress. I wasn't allowed to make my bonus as
> others. On a day-to-day basis going into work, I didn't
> know if I was going to be in Ed's office for no reason.[65]

On the date of his resignation, however, plaintiff had been working
for another employer for approximately one week, although he was
still earning a paycheck from defendant.[66]

---

[60] *Id.* at 274-276.

[61] *Id.* at 266.

[62] Kaplan's deposition at 134.

[63] Plaintiff's deposition at 266.

[64] *Id.* at 199-200.

[65] *Id.* at 200.

[66] *Id.* at 201.

## III. DISCUSSION

### A. Failure to Promote Claims

Defendant moves to dismiss Count I of plaintiff's complaint, arguing that his failure to promote claims are time-barred under Title VII.[67]  Specifically, defendant contends that plaintiff has failed to prove that the discriminatory acts occurred within 180 days of the filing of his EEOC charge.

It is well established that a plaintiff must satisfy a number of administrative prerequisites before filing a Title VII lawsuit. Among the requisite administrative requirements is the initial submission of a charge of discrimination to the Equal Employment Opportunity Commission.  *See* 42 U.S.C. § 2000e-5(e).  The purpose of that statutory provision is to encourage voluntary conciliation rather than litigation.  "Congress clearly intended for the EEOC and the complaining party to attempt a reconciliation of the charge of discrimination before proceeding to federal court, and thus it imposed a time limit during which this reconciliation should occur...."  *Sims v. Trus Joist MacMillan*, 22 F.3d 1059, 1063 (11th Cir. 1994).  A plaintiff must file a charge of discrimination with the EEOC within 180 days of the allegedly unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e).

---

[67] Defendant's reply brief at 5.

In order to assess the timeliness of plaintiff's EEOC charge, the court must "identify precisely the 'unlawful employment practice' of which he complains." *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).  At first glance, plaintiff appears to be complaining about three missed promotional opportunities:  Charles Phillips' promotion to the position of lead man; Mike Moore's "promotion" to the position of back-up lead man; and Jason Borden's "promotion" to the position of back-up lead man.  In response to defendant's motion for summary judgment, however, plaintiff clarified the scope of his failure to promote claims.  Specifically, plaintiff conceded that his claim for promotion to lead man, which Charles Phillips received, was not included in either his EEOC charge or his judicial complaint and, thus, is "a claim that does not exist in this lawsuit."[68]  Rather, plaintiff's failure to promote claims focus upon the two instances in which he was not "promoted" to the position of back-up lead man:

> In his deposition, [plaintiff] clarifies, upon questioning by counsel for [defendant], that his complaint is that Mark Moore and Jason Borden were promoted to the position of back-up lead man over him. ...  Later in his deposition, [plaintiff] does state that he felt like he should have gotten the lead man position that Charles Phillips was promoted to.  Nonetheless, Mr. Phillips was not promoted to the lead man position until after [plaintiff] filed his charge of discrimination on May 11, 1998.  Further,

---

[68] Plaintiff's brief (doc. no. 33) at 10 (citations omitted).

> [plaintiff's] charge of discrimination was never amended,
> nor was a new charge filed, regarding any claim that
> [plaintiff] could assert because of Charles Phillips being
> promoted to the lead man position.[69]

Accordingly, the court limits its analysis to whether those two events occurred within 180 days of the filing of plaintiff's EEOC charge.

Although administrative exhaustion "is not a jurisdictional prerequisite to suit in federal court," *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), it is a condition precedent to the maintenance of an action upon which plaintiff bears the burden of proof.

> Our holding does not mean that plaintiffs no longer must
> prove that they have satisfied the conditions precedent to
> a Title VII action. ... To the contrary, a plaintiff must
> generally allege in his complaint that "all conditions
> precedent to the institution of the lawsuit have been
> fulfilled." ...  If the defendant doubts the veracity of
> plaintiff's allegation, in whole or in part, then the
> defendant may deny "specifically and with particularity"
> that the preconditions have not been fulfilled. ...  The
> plaintiff then bears the burden of proving that the
> conditions precedent, which the defendant has specifically
> joined in issue, have been satisfied.

*Jackson v. Seaboard Coast Line Railroad Company*, 678 F.2d 992, 1010 (11th Cir. 1982).

Here, plaintiff filed his EEOC charge on May 11, 1998.[70]  Thus,

---

[69] *Id.*

[70] Complaint at exhibit A.

if the "promotions" to back-up lead man occurred more than 180 days prior to that date they are time-barred.  Plaintiff, however, failed to precisely identify when either event occurred.  With regard to Mike Moore's "promotion" to back-up lead man, he estimated that the event occurred sometime before January 14, 1997:

> Q.    Prior to or before January 14, 1997, Mark Moore was placed in some type of position that you wanted?
>
> A.    Yes.
>
> Q.    What was the position he was placed in?
>
> A.    Back-up Leadman.
>
> Q.    Okay.  And that's the position we will get to later, but one of the positions you're complaining about in this lawsuit?
>
> A.    Yes.
>
> Q.    Okay.  So, before January 14th of 1997, Mark Moore was placed in the Back-up Leadman position?
>
> A.    Yes.
>
> . . .
>
> Q.    After Mark Moore was placed in the Back-up Leadman position, you complained to Ed, correct?
>
> A.    Yes.[71]

Plaintiff's testimony establishes, therefore, that Mike Moore was promoted <u>long</u> before plaintiff filed his charge of discrimination.

---

[71] Plaintiff's deposition at 173-174.

Moreover, plaintiff also testified that he was aware of the "promotion" at the time it occurred, and complained about the decision to Kaplan, because Moore had "bribed" Catron into giving him the position. Accordingly, plaintiff should have filed his grievance when Moore was promoted instead of waiting more than 180 days after it occurred. This claim is time-barred.

Plaintiff's testimony regarding the date Jason Borden was "promoted" is even more vague. Indeed, plaintiff was unable to remember even generally whether Borden was promoted before or after Moore.

> Q.    Jason Boren became a back-up lead person as well, correct?
>
> A.    Yes.
>
> Q.    Did he become a back-up lead person before or after Mark Moore?
>
> A.    I don't remember.
>
> Q.    Well, let's see if we can jog your memory. Now, you remember we talked about Defendant's Exhibit 35, right?
>
> A.    Yes.
>
> Q.    And this was a ... disciplinary report that Phil Catron gave you [on January 14, 1997]?
>
> A.    Yes.
>
> Q.    When Phil Catron gave you this warning, had Jason Borden already been a back-up lead person?

A.      Don't remember.

Q.      You don't remember?

A.      No.

Q.      So you have no recollection of when Jason Borden
        became back-up lead?

A.      No.

...

Q.      ... Mr. Borden could have been a back-up lead before
        January 1997 or after, you don't know?

A.      I don't, yeah. [72]

Based on plaintiff's inability to identify the date Jason Borden

was "promoted" to back-up lead person, the court finds that

plaintiff has failed to create a genuine issue of material fact as

to whether his EEOC charge was timely filed.   Although plaintiff

generally alleged in his complaint that he had "fulfilled all

conditions precedent to the institution of this action under Title

VII,"[73] that allegation is insufficient to meet his burden at

summary judgment.   *Jackson*, 678 F.2d at 1010.   Accordingly, Count

I of plaintiff's complaint is due to be dismissed in its entirety.[74]

---

[72] *Id.* at 206-207.

[73] Complaint ¶ 2.

[74] To the extent that plaintiff is attempting to state a Title VII claim
based on discrimination in any "other terms and conditions of employment," the
court finds that such claims are due to be dismissed, because they are outside
the scope of plaintiff's EEOC charge.   Specifically, the court notes that
plaintiff has identified two disciplinary instances that occurred prior to the

filing of his EEOC charge.  The first instance occurred on January 14, 1997, when Catron counseled plaintiff for insubordination and failure to follow instructions.  The second instance occurred on March 30, 1998, when the shock switch on his order picker was activated.

It is well established that "the scope of the EEOC complaint should not be strictly interpreted." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1971).  Indeed, the former Fifth Circuit instructs that

> procedural technicalities are not to stand in the way of Title VII complainants.  Nothing in the Act commands or even condones the application of archaic pleading concepts.  On the contrary, the Act was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship.  It would falsify the Act's hopes and ambitions to require verbal precision and finesse from those to be protected, for we know that these endowments are often not theirs to employ.

*Id.*  Moreover, the *Sanchez* court emphasized that "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow."  *Id.*  Thus, the court adopted the following standard for determining whether a judicial complaint exceeds the bounds of the underlying EEOC charge:

> [A] judicial complaint ... "may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission."  In other words, the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Id.* at 466 (citation omitted).

Even so, plaintiff's EEOC charge failed to mention either of the two disciplinary events.  Rather, the sole complaint in that charge is limited to his promotion claims.

> On or about December 1, 1997, the above named employe[r] failed to promote me to the position of lead man.  I have been employed by the employer since September 23, 1993, as an auto [sic] picker operator.
>
> I was never informed of the reasons why I was not selected for the position.
>
> I believe I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended, because of my race Black.  I believe that less senior, less qualified White employees have been assigned positions I was qualified to fill.[]

These facts, even construed liberally in favor of plaintiff, are insufficient to

## B. Plaintiff's § 1981 Claims

In Count II of his complaint, plaintiff alleges that defendant violated § 1981 by "compensat[ing] white employees who take off for being sick but ... not allow[ing] the same for Black employees such as the Plaintiff."[75] Defendant moves to dismiss this claim, arguing that plaintiff failed to establish a prima facie case of racial discrimination.[76] Specifically, defendant contends that plaintiff has failed to identify a similarly situated white employee that was treated more favorably when committing the same violation of company policy.  Plaintiff admitted that he was not paid for one "day of choice" during 1998, because he failed to work both the day

---

put either the defendant or the EEOC on notice of any complaints based upon discipline.  Accordingly, they are due to be dismissed.

[75] Plaintiff's complaint ¶ 12.

[76] Defendant argues that "[p]laintiff's only section 1981 claim is based on his belief that when 'he called in sick, Ed took [his] doc [day of choice] pay.'" Defendant's brief (doc. no. 27) at 14 (citation omitted).  Plaintiff did not disagree with defendant's characterization of his complaint in his responsive brief.  Moreover, plaintiff clarified in his deposition that he was not bringing a parallel claim under § 1981 for defendant's failure to promote him.

> Q.    ... We've talked about the sick leave related to you and Terry
>       Demastus, right?
> A.    Right.
> Q.    And we've talked about this issue with the funeral leave with
>       Andy Bailey, correct?
> A.    Correct.
> Q.    Is there anything else that your section 1981 claim is based
>       on?
> A.    No.

Plaintiff's deposition at 259.  Accordingly, the court limits its discussion to plaintiff's loss of pay for one "day of choice," because he failed to work the day before such leave —— allegedly due to sickness.

before and the day after such day off.  Terry DeMastus, the white employee identified by plaintiff in his deposition, did not commit the same violation of company policy and, thus, is not similarly situated.[77]

In response, plaintiff argues that he also was not allowed his full three days of paid funeral leave.[78]  He contends that defendant's "policy allows employees to have three days off work with pay when the death of an immediate family member has occurred."[79]  Plaintiff alleges that he "was only allowed two days off work with pay," although Andy Bailey "was allowed three days off work with pay."[80]

To establish a claim of racial discrimination under 42 U.S.C. § 1981, plaintiff must prove that his employer intended to discriminate against him on the basis of his race.  *See, e.g., Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968) ("In light of the concerns that led Congress to adopt it and the

---

[77] *See* the discussion in § II.B *supra*.

[78] The court notes that plaintiff does not advance any legal arguments in defense of his § 1981 claim.  Plaintiff merely attempts to create a factual issue, by identifying another similarly situated employee.  Plaintiff's brief at 7.

[79] *Id.*

[80] Plaintiff's deposition at 252.

content of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law....");  *Little v. United Technologies*, 103 F.3d 956, 961 (11th Cir. 1997). Three forms of proof may be used to establish an employer's intent to discriminate: (1) *statistical proof* of a pattern of discrimination[81]; (2) *direct evidence* of a discriminatory animus[82]; or (3) *circumstantial evidence*.  The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon which form of proof is used.  Here, plaintiff relies on circumstantial evidence of discrimination, because he has failed to offer either direct evidence or statistical proof of a pattern of discrimination.

When evaluating racial discrimination claims supported by circumstantial evidence, courts are guided by the now familiar analytical framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d

---

[81]*See, e.g.,* Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1027 (11th Cir. 1994).

[82]*See, e.g.,* Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989).

407(1993); *Texas Department of Community Affairs v. Burdine*, 450
U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).   Although the
*McDonnell Douglas* analytical framework was developed in the context
of Title VII disparate treatment cases, it also is applied to
claims founded upon § 1981.   *See Patterson v. McLean Credit Union*,
491 U.S. 164, 186, 109 S.Ct. 2363, 2377-78 (1989) (applying
*McDonnell Douglas* analytical framework to claims under 42 U.S.C. §
1981); *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir.
1994) ("The *McDonnell Douglas* scheme for the allocation of burdens
and the order of presentation of proof also applies in § 1981 cases
involving discriminatory treatment in employment situations.").

Under that framework, the plaintiff bears the initial burden of
establishing a prima facie case of discrimination.   If a plaintiff
does so, then at the second stage of analysis the burden of
production shifts to the defendant to rebut the presumption[83] of
intentional discrimination thus created by articulating legitimate,
nondiscriminatory reasons for the contested employment action.   *See*
*Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.   If a defendant
carries its burden, then in the final step of inquiry the plaintiff

---

[83]See Walker v. Mortham, 158 F.3d 1177, 1185 n.10 (11th Cir. 1998), for an
excellent discussion of the reasons why presentation of a prima facie case
creates "a *presumption*, and not an *inference*, of intentional discrimination."
(Emphasis in original.)

must have an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). The plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' ...." *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)

(internal quotation marks omitted)).

To establish a prima facie case of racial discrimination, plaintiff must show that: 1) he belongs to a racial minority; 2) he was subjected to an adverse job action; 3) his employer treated similarly situated employees outside his classification more favorably; and 4) he was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Plaintiff has failed to meet this burden, however, for several reasons.

First, plaintiff has failed to establish that Terry DeMastus is a similarly situated employee. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield*, 115 F.3d at 1562. Plaintiff complains that he should have been paid for a day of choice, although he acknowledges that he did not work the day before his day of choice as he was required to do under company policy.[84] In contrast, DeMastus was paid for taking one of his sick days, not a day of choice.[85] Plaintiff nevertheless argues that DeMastus should not have been paid. Specifically, plaintiff

---

[84] Plaintiff's deposition at 228.

[85] *Id.* at 228, 230.

contends that DeMastus violated the company's call-in procedure: he did not personally notify defendant that he intended to take a day off due to illness; rather, DeMastus' wife notified defendant, and defendant accepted the wife's call as sufficient notification.[86] Plaintiff also reveals, however, that defendant changed its call-in procedure _subsequent_ to the DeMastus incident, to require an employee to personally notify his supervisor.[87]

> A.   ... And on another occasion, when the company policy changed, Ed was all around the desk and Curtis Suddith told Ed in front of everybody that you have to call in not your wife _and ain't that right_, _Terry_ [DeMastus], and Ed agreed with him and joked about it himself on that day.
>
> Q.   And this was after Terry's wife had called in?
>
> A.   Yes.[[88]]

Therefore, there is no evidence that DeMastus actually violated a company policy that was in place on the occasion in question.  He is not similarly situated to plaintiff.

Moreover, plaintiff has failed to establish a prima facie case based on his claims of being denied one day of funeral leave. Specifically, plaintiff contends that Andy Bailey was paid for three days, whereas he only was paid for two.[89]  Unfortunately,

---

[86] _Id._ at 228.

[87] _Id._ at 229.

[88] _Id._ (emphasis added).

[89] Plaintiff's deposition at 252.

plaintiff has failed to provide any evidence reflecting Bailey's race and, therefore, the court is unable to conclude that defendant "treated similarly situated employees outside his classification more favorably." Accordingly, plaintiff's § 1981 claims are due to be dismissed.

## C. Retaliation and Constructive Discharge

Plaintiff alleges that defendant "subjected [him] to unfair treatment, unfavorable discipline and job assignments" in retaliation for his EEOC charge that was filed on May 11, 1998.[90] Plaintiff also alleges that he was forced to resign from his employment with defendant "as a result of the unfavorable treatment [he] was subjected to in retaliation for seeking protection of his civil rights."[91]

Defendant contends that both claims are due to be dismissed because plaintiff never filed a separate EEOC charge and, therefore, is barred from filing a lawsuit in this court. Plaintiff responds by asserting that "[w]here a plaintiff has timely filed a charge of discrimination with the EEOC, it is unnecessary for the plaintiff to exhaust administrative remedies prior to urging a ... claim growing out of an earlier charge."[92]

---

[90] First Amended Complaint ¶ 25.

[91] *Id.* ¶ 28.

[92] Plaintiff's brief at 18.

The operative word in plaintiff's argument is "<u>timely</u>": in order for a plaintiff to rely on a previously filed EEOC charge, the prior EEOC charge must be <u>timely</u> filed. *See Hargett v. Valley Federal Savings Bank*, 60 F.3d 754, 762 (11th Cir. 1995). In *Gupta v. East Texas State University*, 654 F.2d 411, 414 (5th Cir. Unit A August 28, 1981),[93] the former Fifth Circuit announced the general rule that

> it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge: the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is <u>properly before the court</u>.

*Gupta*, 654 F.2d at 414 (emphasis supplied). The Eleventh Circuit later clarified the *Gupta* rule by holding that a prior administrative charge is "properly before the court" only if it was timely filed with the EEOC. *See Hargett*, 60 F.3d at 761. In reaching this conclusion, the court adopted the reasoning of the Fifth Circuit in *Barrow v. New Orleans Steamship Ass'n*, 932 F.2d 473 (5th Cir. 1991), and the Eighth Circuit in *Wentz v. Maryland Casualty Company*, 869 F.2d 1153 (8th Cir. 1989). The Eleventh

---

[93] While decision rendered by the Unit A panel of the former Fifth Circuit are not binding precedent, such decisions, nevertheless, are considered "persuasive [authority] in the Eleventh Circuit." *United States v. Chapman*, 866 F.2d 1326, 1332 (11th Cir. 1989) (citing *Matthews v. United States*, 713 F.2d 677, 683 n.1 (11th Cir. 1983), and *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982)).

Circuit explained:

> The Fifth Circuit held [in *Barrow*] that the retaliation claim which was not filed with the EEOC could not be attached to the untimely filed age discrimination suit. The Fifth Circuit stated
>
>> [b]ecause one of the age discrimination charges was untimely and the other was not presented first to the EEOC, they were not 'properly' before the district court. Thus, the retaliation charge has no charge on which to attach itself, and the district court correctly dismissed it.

*Hargett*, 60 F.3d at 762 (quoting *Barrow*, 932 F.2d at 478).

Based on the decision in *Hargett*, the court concludes that plaintiff's retaliation and constructive discharge claims must fail, because they are based on plaintiff's prior EEOC charge which the court has determined to be untimely filed. Accordingly, they are due to be dismissed.

**D. Plaintiff's Negligence Claim**

In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are pendant to the federal claim. *See* 28 U.S.C. § 1367(a). The district court may decline to exercise supplemental jurisdiction when:

> (1)    the claim raises a novel or complex issue of State law,
>
> (2)    the claim substantially predominates over the claim

34

or claims over which the district court has original jurisdiction,

(3)   the district court has dismissed all claims over which it has original jurisdiction, or

(4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Having disposed of all of plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over the remaining negligence claim pursuant to 28 U.S.C. § 1367(c)(3). This claim is due to be dismissed without prejudice, so that plaintiff may pursue this claim in the proper state court, under the time guidelines established in 28 U.S.C. § 1367(d).

## IV.   CONCLUSION

Based on the foregoing, the court finds that defendant's motion for summary judgment is due to be granted in part and plaintiff's federal claims dismissed. The court also declines to exercise supplemental jurisdiction over plaintiff's state law claim for negligence, because it has disposed of all claims over which it allegedly had original jurisdiction. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this _5th_ day of June, 2000.

United States District Judge